## HALLMARK PRODUCTIONS, Inc. v. MOSLEY et al.

### No. 14311.

United States Court of Appeals, Eighth Circuit.

July 24, 1951.

Rehearing Denied Aug. 11, 1951.

J. L. London, St. Louis, Mo. (Louis L. Hicks, Clayton, Mo., on the brief), for appellant.

Lester Watson, Clayton, Mo. (Stanley Wallach and Herbert W. Ziercher, Clayton, Mo., on the brief), for appellees Arthur C. Mosley and Stanley Wallach.

Francis C. Flynn and Norman C. Parker, St. Louis, Mo., for appellee PRBH Corp.

Before GARDNER, Chief Judge, and RIDDICK and COLLET, Circuit Judges.

GARDNER, Chief Judge.

This was a suit brought by appellant Hallmark Productions, Inc., an Ohio corporation, against PRBH Corporation, a Missouri corporation, and against the sheriff and prosecuting attorney respectively of St. Louis County, Missouri. As against PRBH Corporation appellant seeks specific performance of a written contract and a declaratory judgment, and as against the sheriff and prosecuting attorney seeks injunction against these officers enjoining them from interfering with the performance of a contract entered into between Hallmark Productions, Inc. and the PRBH Corporation. The parties will be referred to as they were designated in the trial court.

Plaintiff is the owner and distributor of a film known as "Mom & Dad". On September 7, 1950 it entered into a contract with the defendant PRBH Corporation by the terms of which the latter corporation agreed to exhibit the film Mom & Dad at the Sky Line Drive-In Theater located in St. Louis County, Missouri. In pursuance of this contract the picture was exhibited on the evening of September 25, 1950, at which time it was viewed by two deputy sheriffs of St. Louis County, Missouri, and on the following day a letter was sent by defendant Stanley Wallach, prosecuting attorney, to PRBH Corporation, which letter contained the following statement:

"After a viewing of the picture Mom & Dad at your above listed theater by members of the St. Louis County Sheriff's Office, the evening of September 25th, 1950, and a report to this office that same is of an obscene and indecent nature, it is hereby ordered that the showing of this picture shall be discontinued forthwith.

"Your failure to comply herewith will result in arrest and prosecution of you and the members of your staff involved in any further showing of this picture."

In addition to this letter, the assistant prosecuting attorney orally stated to the

manager of the theater that if the exhibition of the picture were not discontinued "we will arrest the moving picture machine operators and we will arrest the manager, the one in charge of the theater". The night of September 26th a deputy sheriff came to the theater to check up on what picture was being shown. Following the receipt of this letter and the statement of the deputy prosecuting attorney threatening arrest and prosecution of the officers or employees of the PRBH Corporation, there was no further showing of the picture. Under the terms of the contract the PRBH Corporation agreed to show the picture beginning September 25, 1950, and continuing until receipts should drop below $400.00 nightly. On the night of September 25th there were approximately 1500 people present at the theater, the admission charge was sixty cents. Following the refusal by PRBH Corporation to continue showing the picture, a suit was instituted in the St. Louis County Circuit Court by the producer of the film Mom & Dad seeking to enjoin Arthur C. Mosley and Stanley Wallach, sheriff and prosecuting attorney respectively of St. Louis County, Missouri, from interfering with the exhibition of this picture, which suit was dismissed prior to the institution of the present action, whether without prejudice or on its merits does not appear from the record. Diversity of citizenship was alleged but it appeared from the testimony that the interest of plaintiff and PRBH Corporation was identical, and the court expressed the view that if the parties were properly aligned there would be no jurisdiction based upon diversity of citizenship. There was evidence from which the Court might have determined whether or not this picture was obscene, immoral or indecent. Mr. Harry Newbold, one of the deputy sheriffs who viewed the picture, testified as to its nature. He testified that as a part of the program a Mr. Elliot gave a lecture. This lecture was given at what is referred to as an intermission. In connection with the lecture he exhibited and sold two booklets, one entitled "The Manual of Hygiene—Father and Son" and the other entitled "The Digest of Hygiene—Mother and Daughter". These were sold at $1.00 a piece. The witness testified with reference to this lecture: "He had two books, one was for the female sex and one was for the male sex. I believe he made mention of the father's taking the male sex book in order that he might explain to his son all the contents of this particular book, and likewise the same thing as to the mother having the female sex book, where she would be enlightened as to information of sex matters between her and her daughter. * * * Then he (the lecturer) said the picture would continue and which would be rather gruesome, probably would be particularly offensive to the people, might have sickness or an ailment, that they would be able to get a nurse who was on duty at the concession stand, along with an assistant, that if anyone should faint or need that assistance to send someone over to the concession stand, they would immediately come to the automobile and render assistance. * * * There was a line of traffic, I believe they formed two lines or possibly three lines, and we were on the middle line, and there was one motor vehicle, there was a very young person, a boy, and two girls on that motorcycle, and they pulled out just ahead of us. I even called attention, I said, 'Looks like there are juveniles here'—he said 'yes'. They were around 16 years of age, I imagine, maybe a little less. Nothing was said by Mr. Parker (the manager) that he was restricting the picture to children under 16. * * * I am a father, I have three daughters and two sons. In my opinion the picture should not be shown to the general public without any restrictions whatever. If you want my personal opinion I wouldn't allow my children to go. I wouldn't take my son to see it personally. * * * I would be embarrassed, the scenes are pretty blunt. They are awfully blunt if you ask me. The picture exposes all the private parts. If you want my personal opinion, if you call that obscene, I could say yes, it is obscene in that respect. My understanding of the word 'obscene' would be exposing the private parts of a male or female or a nude." Asked what part of the picture was

immoral, the witness testified: "Well I tell you, they lead you on up, they first have a picture of a girl in a prom, apparently a teenager. She becomes involved with a boy. Later she becomes— she is pregnant, so on, going to school. There is an explanation by their teacher of the different sex, male and female, what constitutes pregnancy, about diseases and so forth, and it leads on in the scenes of the high school where he is discharged for having a discussion between male and female in the same classes and altogether he was discharged entirely. Then they show the actual birth of a baby, that is in the picture, the private parts of this woman is shown, open and coming apart. That is in a natural birth. Then you see the baby's head coming through the private parts of this woman, and then you see the doctor's hands go in and tug and pull to get the baby out. It is certainly very ugly. Then you go on down to where you see the caesarean operation * * * There's just a half dozen cuts where they go through layer after layer of flesh. They even explain why the blood isn't trickling in there, what holds back the blood to a certain degree is by some sort of chemical or medicine the doctor uses, yet you can see the blood trickling as they cut. They get down to this sac, the female organ, and that is cut, and then when they cut the sac, there is an expansion of water and a sort of mattery water, whatever it happens to be, comes out. He (the lecturer) explains that and then the picture explains that that baby has to be taken out in a certain matter of seconds. The hands go in there, start pulling that baby out of the sac. They show from where it is taken over and handed to a doctor, medicine put in the eyes, laid on the table, regular delivery on an operating table, on the delivery table, completely in every form.

"Q. Now is that what you say is indecent or immoral? A. I would say it is very nasty, yes.

"Q. You mean it is nasty; you mean in sense of indecent? A. Yes, I would say it would be in that respect, certainly. That is my opinion. You told me the other day, would I give my personal opinion, and that is what I had in mind the whole time.

"Q. Is there any other part of the picture you think is indecent, immoral or obscene? A. Then it goes down to the disease forms of it, shows forms of syphilis, shows how it eats the mouth, eats the lips, get to the extent of a hole in the roof of the mouth, exposes the whole entire body of a male covered with sores, with the exception of his private parts, there is a white strip on, I imagine it is about eight inches down, which covers the exact private part of the male, but the rest of the body is exposed entirely."

A number of other witnesses, without going into detail expressed their opinion as to the character of the picture, giving it as their opinion that it was obscene, immoral and indecent. On the other hand, there was testimony on behalf of plaintiff which did not go into the details of the picture but which consisted of expressions of opinions that the picture was educational and not obscene. Other facts will be developed during the course of this opinion.

The Court found as a fact that "the testimony of witnesses shows that the interest of plaintiff and defendant PRBH Corporation, a Missouri corporation, is identical". The Court also found that the prosecuting attorney of St. Louis County, Missouri, could have instituted an injunction proceeding in the state court against defendant PRBH Corporation to enjoin it from exhibiting the motion picture on the theory that the same was obscene and indecent, but that he did not institute such proceeding but only indicated by letter that if the picture was shown again "the President of PRBH Corporation and the members of his staff would be arrested and prosecuted." The Court also found "There is no allegation in the present cause that there is not a state statute under which the prosecuting attorney proposed to proceed or that the state statute was unconstitutional". The Court made no finding on the contested issue as to whether or not the picture as exhibited is obscene, indecent or immoral. The Court concluded, as a matter of law, that as a court of equity,

the absence of an allegation that there was a state statute under which the prosecuting attorney proposed to proceed or that the state statute was unconstitutional, that the suit in equity was merely an effort on the part of plaintiff to prevent its being subject to the police powers of the State of Missouri, and that as a court of equity it had no jurisdiction to punish parties for the commission of a criminal offense, nor would it ordinarily grant injunctions against law enforcement officers to prevent criminal prosecutions. In its judgment the court recited that the plaintiff being a corporation could not complain of being deprived of freedom of speech, that it was not claimed that the state officers were proceeding by authority of an unconstitutional statute and that there was no showing that irreparable injury would result if the requested injunction were denied. The Court then adjudged that the bill of complaint be dismissed and that the relief therein prayed be denied.

In seeking reversal, plaintiff contends in substance that, (1) the Court had jurisdiction under the Civil Rights Act and that a corporation is a person within the meaning of the Civil Rights Act as applied to the 14th Amendment to the Constitution of the United States; (2) that plaintiff was entitled to a declaratory judgment; (3) that plaintiff was entitled to a decree of specific performance or a mandatory injunction against PRBH Corporation; (4) that plaintiff was entitled to injunctive relief against defendant Arthur C. Mosley and Stanley Wallach because they acted under color of office without authority, thereby depriving plaintiff of constitutional rights; (5) the picture in question was neither obscene, indecent nor immoral.

■ From the allegations of the complaint it is apparent that plaintiff sought to invoke the jurisdiction of the court on the ground of diversity of citizenship. The court, however, found that there was no substantial controversy between the plaintiff and the defendant PRBH Corporation but that the interest of these two parties was identical. The contract existed between the plaintiff and the PRBH Corporation which both were willing and anxious to carry out, and the only reason it was not carried out by the defendant PRBH Corporation was the fact that it did not wish to incur the danger of arrest and prosecution by a state officer. The pleadings indicate that the parties were in accord on this question, as the plaintiff in its complaint alleges that it requested defendant PRBH Corporation to join as a plaintiff, and it is alleged that because of this refusal it was made a party defendant. In the complaint plaintiff asked for specific performance of its contract but, as observed, there was no controversy between the parties with reference to the contract, and the only obstacle to its performance was the alleged acts of the defendant officers about which both the plaintiff and the defendant PRBH Corporation complain. There is no claim that the defendant PRBH Corporation was insolvent or unable to respond in damages and we think the Court was justified in holding that on a realignment the defendant PRBH Corporation should be considered as a party plaintiff. City of Indianapolis v. Chase National Bank, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47. So considered there was no diversity of citizenship.

■ So far as the complaint charged a cause of action under the declaratory judgment act, diversity of citizenship was essential to jurisdiction of the court.

■ It is, however, now claimed that jurisdiction was not based solely on diversity of citizenship but that plaintiff invoked Section 43, Title 8, U.S.C.A., for the protection of its rights. This section provides as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, * * * or other proper proceeding for redress."

An examination of the complaint fails to show that the defendant officers were

acting or pretending to act under color of any law. Johnson v. Middleton, 7 Cir., 175 F.2d 535. In fact it is alleged that the officers and employees, not of the Hallmark Productions, Inc., but of PRBH Corporation were threatened with arrest. It is then alleged that this action on behalf of the officers "in designating themselves as self-appointed censors is without any warrant of law, is arbitrary and oppressive, and is without sanction of any statute or lawful authority". It is also alleged that the written order of the prosecuting attorney demanding "that the showing of the picture shall be discontinued forthwith" was without warrant of law or lawful authority. According to the allegations of the complaint the act of the state officers was not under color of any law, nor was there any pretense that it was under color of any statute, ordinance, regulation, custom, or usage, but the allegations of the complaint are to the effect that their actions were arbitrary and without authority or under color of any law. Not only were there no allegations in the complaint that the defendant officers were acting under color of law, but there was no proof offered by plaintiff that they were so acting or that they were pretending so to act.

■ In passing it should perhaps be noted that plaintiff urges that the acts of the defendant officers abridged the right of free speech guaranteed it by the Constitution, because it had the effect of silencing its representatives, who, during the course of the showing of the picture, delivered lectures. The individual delivering the lecture, however, is not a party to this suit and the right of free speech guaranteed by Section 1 of the 14th Amendment is a right guaranteed to natural persons only. Hague v. Committee of Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

■■ In the final analysis, the plaintiff's action is one brought against third parties for interference with a contract which plaintiff had with PRBH Corporation. There are certainly circumstances under which a court having jurisdiction might be authorized to enjoin third parties from interfering with the performance of a plaintiff's contract. Undoubtedly one has the right freely to contract, and this right or privilege may not be destroyed by force or illegal means, and any unjustifiable interference by a third party with the contract, which results in irreparable injury to the complaining party for which the law furnishes no adequate and complete relief, may be enjoined, provided the contract is not in violation of other law or public policy. Be that as it may, the contract here is between plaintiff and PRBH Corporation and is being interfered with by the defendant officers. The parties to the contract are in effect the plaintiffs and there is no diversity of citizenship between PRBH Corporation and the defending officers. Manifestly, if such a cause of action in fact exists it cannot be prosecuted in the Federal Court.

■ At most an arrest and criminal prosecution was threatened, not as to the plaintiff, but as to PRBH Corporation and a court of equity will not ordinarily enjoin criminal prosecutions. Smith v. Tillotson, 8 Cir., 29 F.2d 535; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 882, 87 L.Ed. 1324; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416; Beal v. Missouri Pacific Railroad Co., 312 U.S. 45, 61 S.Ct. 418, 420, 85 L.Ed. 577. As said in Beal v. Missouri Pacific Railroad Co.: "No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid."

■ Although the trial court made no finding on the charge that the picture Mom & Dad is obscene, immoral or indecent, appellant urges us to find as a matter of law that it is not of such a character. We have set out the testimony of a witness who viewed this picture and the description stands without dispute in the record. We think it cannot be said as a matter of law that the picture was not obscene, immoral and indecent. The term obscene is

confessedly not susceptible of an exact definition universally applicable. It may here be observed that the picture is not a work of art, neither is it of value as a literary production, nor is it a work for the instruction of medical men. It is claimed to be educational to be sure, and if addressed to the medical profession or perhaps to professional nurses it might possibly be so considered. It is, however, proposed indiscriminately to show the picture without restriction to all classes, ages and conditions, and the question is whether so viewed it is obscene, immoral and indecent. In such circumstances we think the term obscene means something offensive to modesty or decency. In Hadley v. State, 205 Ark. 1027, 172 S.W.2d 237, 239, the court, among other things, said: "The word 'obscene' not being a technical term of the law, and not being susceptible of exact definition in its judicial or legal use, this question must in any given case be submitted to the jury as a question of fact and the finding of the court, sitting as a jury, in the instant case may not be disturbed if that finding is sustained by testimony sufficient to support that conclusion by an ordinary man of average intelligence."

Obscenity was indictable at common law and, while it has never been considered as susceptible of exact definition, one of the tests often used is whether it shocks the ordinary and common sense of men as an indecency. State v. Van Wye, 136 Mo. 227, 37 S.W. 938. The term "obscene and indecent exhibition of the person" has been construed to mean an exposure of those parts of the person which are commonly considered as private and which custom and decency require should be covered and kept concealed from public sight. Indecent exposure of person was a criminal offense at common law. In Towne v. Eisner, 245 U.S. 418, 38 S.Ct. 158, 159, 62 L.Ed. 372, the Supreme Court, speaking through the late Mr. Justice Holmes, said: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

In United States v. Kennerley, D.C., 209 F. 119, 121, the Court defines the term obscene as "the present critical point in the compromise between candor and shame at which the community may have arrived here and now."

 Manifestly, the question is one of fact to be determined either by jury or the court acting as the trier of facts. The trial court not having made any direct finding on this question, we are not disposed to base our decision upon the controverted fact as we think with the trial court its decision is not essential to a determination of the issues in this case.

The judgment appealed from is therefore affirmed.